479 So.2d 1195 (1985)
CONTINENTAL TELEPHONE COMPANY OF the SOUTH
v.
ALABAMA PUBLIC SERVICE COMMISSION; Jim Sullivan as its President; Lynn Greer, Associate Commissioner; and Jim Folsom, Jr., Associate Commissioner.
Governor George C. WALLACE, By and Through the PUBLIC STAFF FOR UTILITY CONSUMER PROTECTION
v.
ALABAMA PUBLIC SERVICE COMMISSION; Jim Sullivan as its President; Lynn Greer, Associate Commissioner; and Jim Folsom, Jr., Associate Commissioner.
83-1419, 84-48.
Supreme Court of Alabama.
October 4, 1985.
Rehearing Denied November 8, 1985.
*1197 John E. Grenier and Janet W. Taylor of Lange, Simpson, Robinson & Somerville, Birmingham, for appellant Continental Telephone Co. of South (83-1419).
Euel A. Screws, Jr., Laveeda Morgan Battle, Amy Watson Stewart, and Wendell Cauley, Montgomery for appellant Governor's Public Staff for Utility Consumer Protection (84-48).
Stephen L. Skipper and Robert M. Hill, Jr. of Hill & Young, Florence, and William J. Samford, Jr., Susan Shirock DePaula, and Robert F. Smith of Pappanastos, Samford, Roberts & Blanchard, Montgomery, Charles A. Graddick, Atty. Gen., and Robert L. Rash, Asst. Atty. Gen., for Alabama Public Service Comm. (83-1419).
PER CURIAM.
This is an appeal by Continental Telephone Company of the South and a crossappeal by Governor George C. Wallace by and through the Public Staff for Utility Consumer Protection from an order of the Alabama Public Service Commission. The appeals were taken pursuant to the provisions of Code 1975, § 37-1-140.
On January 17, 1984, Continental Telephone Co. filed a proposed rate schedule with the Alabama Public Service Commission, requesting a rate increase of $6,547,990. After a hearing, at which the Governor's Public Staff for Utility Consumer Protection (Public Staff) and the Alabama Attorney General intervened, the APSC granted Continental a rate increase of $367,352. Continental and the Public Staff petitioned the APSC for reconsideration[1] and, after the APSC took no action on their petitions, appealed to this Court, pursuant to the provisions of Code 1975, § 37-1-140. Continental applied for supersedeas, which, after oral argument, this Court granted in the amount of $1,573,359.[2]

*1198 I

WAS CONTINENTAL ACCORDED DUE PROCESS?
In its brief, and at oral argument, Continental vigorously insisted that it was deprived of due process of law during the hearings before the Commission. Continental contends that because it was denied due process, the Commission's order should be declared to be null and void and "the schedule of rates which Continental filed with the Commission should take effect as a matter of law."
Continental submits that three distinct violations of its rights to due process occurred in this proceeding, and claims that one of those violations also was a violation of the doctrine of separation of powers, and that each violation was independently sufficient to require that the Commission's final order be vacated.
The alleged violations include:
(a) the Attorney General's participation as both an adversary party-intervenor and an advisor to the Commission, through an assistant Attorney General;
(b) the Public Staff's adversary party participation in the proceedings on behalf of the Governor, because the Public Staff is merely a part of the Commission, and cannot be separated from the Commission; and
(c) the intrafamily relationship between the director of the Public Staff and a staff member of the Commission in violation of the basic ethical principle prohibiting conflicts of interest.
Similar "due process" claims were raised by Continental in its last appeal of a rate order. Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 427 So.2d 981 (Ala. 1982). There, this Court discussed the "due process" claims, with a caveat that "we should not be understood as holding that the Public Staff had any legal status *1199 as a party." 427 So.2d at 997. Justice Shores specially concurred, as follows:
"I concur in the opinion authored by Justice Maddox but I would not address the issue of the so-called ex parte communication between the Commission and its `Public Staff.' The Commission may organize its staff any way it sees fit, but by doing so may not enlarge its authority beyond that delegated to it by the legislature and cannot by attaching a label to a part of its personnel clothe it with a legal identity beyond what it isthe Commission's staff."
Joining her special concurrence were Chief Justice Torbert and Associate Justices Jones, Almon, and Embry. After issuance of this opinion, and apparently in response to the statements made in the opinion concerning the legality of the Public Staff's participation in that proceeding, Governor George C. Wallace and the Commission took actions regarding the Public Staff.
On September 20, 1983, the Governor signed Executive Order No. 17, establishing a "Public Staff in the Executive Branch of State Government of the Governor." Along with giving it other duties, Executive Order No. 17 instructed the Public Staff to "(3) draw from the Public Service Commission persons who are trained and experienced in rate making techniques and procedures with such persons' compensation funded by the Public Service Commission."
On December 3, 1983, the Commission issued a General Order which placed the Commission's Trial Staff "on loan" to the Public Staff for Utility Consumer Protection. The General Order stated that the loaned individuals would remain employees of the Commission and lose no rights, benefits, or compensation because of the transfer. The Commission further committed itself to fund the Public Staff and to employ additional individuals to assign to the Public Staff. Finally, the General Order provided that if the Public Staff is abolished or ceases to exist, the loaned personnel shall return to comparable positions within the Commission.
Continental thought that the Governor was without authority to issue the executive order, and that the Commission was without authority to take the action it took regarding the Public Staff, and, based upon its belief that its constitutional rights were being violated, moved to strike all the evidence presented by the Public Staff.
Governor Wallace argued, in response to Continental's motion to strike all evidence presented by the Public Staff, that his Executive Order No. 17, and the Commission's General Order of December 5, 1983, corrected the concerns specially addressed by Justice Shores in the 1982 Continental case. Continental disagrees, and we are constrained to hold that the actions taken by the Governor and the Commission did not solve the constitutional infirmities pointed out by this Court in the 1982 Continental case.
We are of the opinion that the Commission, by loaning its Trial Staff to the Governor under a new name, the Public Staff, merely attached a new label to a part of its personnel and attempted to clothe its personnel with a legal identity beyond what it wasthe Commission's Staff. In the Commission's General Order itself, the Commission states:
"All said employees comprising the present Trial Staff of this Commission shall remain employees of this Commission and this Order in no way shall be construed as affecting, in any way, any employee rights or benefits, classification or compensation. [Emphasis added.]
"...
"In the event that the Public Staff for Utility Consumer Protection is abolished, dismantled or ceases to exist as part of the Executive Branch of the State government or of the Governor, said personnel so loaned by this Order shall be returned to comparable positions within the Alabama Public Service Commission. [Emphasis added.]"
*1200 It seems clear that the Public Staff is merely the Commission Staff, or former Trial Staff, under a new label.
It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process. Fairness, of course, requires an absence of actual bias in the trial of cases, but our system has always endeavored to prevent even the probability of unfairness. In the 1982 Continental case, this Court recognized that due process was required in Commission proceedings and outlined a remedy for denial of due process. There, this Court said:
"[T]he Court, for many years, has recognized that in those proceedings, such as rate cases, which are quasi-judicial in nature, due process must be observed and preserved for all parties to the proceedings. Alabama Power Co. v. City of Ft. Payne, 237 Ala. 459, 464, 187 So. 632, 636 (1939). Moreover, where the Public Service Commission is involved in rate cases, we have held that `the Commission, in contemplation of law, is without interest in the controversy and sits as an impartial tribunal with statutory powers, legislative in character, to regulate the rates of public utilities.' Birmingham Electric Co. v. Alabama Pub. Ser. Comm'n, 254 Ala. 119, 125, 47 So.2d 449, 452 (1950). The remedy open to the Court when we have determined that proceedings before the Commission culminating in an order have abrogated the fundamental principle of due process is to void the order. Alabama Pub. Serv. Comm'n v. Redwing Carriers, Inc., 281 Ala. 111, 117, 199 So.2d 653, 658 (1967)."
See also, Ex parte Alabama Textile Manufacturers Ass'n, 283 Ala. 228, 215 So.2d 443 (1968); Ex parte Alabama Pub. Serv. Comm'n, 268 Ala. 322, 106 So.2d 158 (1958).
Because we find that Continental's "due process" rights were violated, we have no choice but to insure that Continental will be accorded "due process." We elect to remand the cause to the Commission under the authority granted to this Court by Code 1975, § 37-1-143, for the purpose of conducting further proceedings as we shall hereinafter direct. Code 1975, § 37-1-143, provides, in part, as follows:
"The court shall review the case upon the certified record or transcript of the commission, and no new or additional evidence shall be introduced or oral testimony heard, but the court may, in advance of its judgment, remand the case to the commission for the purpose of taking additional testimony or other proceedings."
We believe that a remand of the cause will accord to Continental those "due process" rights to which it is entitled. Consequently, we refuse to void the order of the Commission, as Continental requests. Because of the action we take, we find it unnecessary to address the "separation of powers" argument Continental makes. Furthermore, because of the disposition we make on Continental's "due process" claim with regard to the Public Staff, we need not decide whether Continental's claim that its "due process" rights were also violated because the Attorney General participated as both an adversary party-intervenor and as an advisor to the Commission, through an assistant attorney general. Additionally, we pretermit any discussion of Continental's claim that the intrafamily relationship between the Director of the Public Staff and a staff member of the Commission violated ethical principles prohibiting conflicts of interest.
Even though we elect to remand the cause for "further proceedings," we have, nevertheless, reviewed Continental's claims on the merits, and, to facilitate the process on remand, we include our observations, which the parties may use and which the Commission may consider and apply. In reviewing the merits of Continental's claims, we have considered all the evidence and all the arguments, because we believe that such a review will assist the Commission and the parties in the proceedings on remand.

II

SCOPE OF REVIEW
In reviewing the merits of Continental's claims of confiscation, we have applied the *1201 scope of review which is clearly delineated in the last appeal to the Court by Continental:
"Traditionally, when confiscation has been alleged in the context of public utility rate cases, the Court has operated under a broad scope of review and exercised its independent judgment as to the law and facts involved rather than presuming the Commission order to be valid or reasonable. See e.g., Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 376 So.2d 1358 (Ala.1979); Alabama Power Co. v. Alabama Pub. Serv. Comm'n., 359 So.2d 776 (Ala.1978); General Tel. Co. of the Southeast v. Alabama Pub. Serv. Comm'n., 335 So.2d 151 (Ala.1976). In Alabama Gas Corp. v. Alabama Pub. Serv. Comm'n, 425 So.2d 430 (Ala.1982), we have modified this previous standard of review. The applicable portion of that opinion is recited here:
"`Similarly, § 37-1-124, Code 1975, prescribes that the Commission's order shall be taken as prima facie just and reasonable and that this court shall set aside the order only if it finds that:
"`(1) The Commission erred to the prejudice of appellant's substantial rights in its application of the law; or
"`(2) The order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence.
"`Using the broad scope of review when confiscation is merely alleged has rendered this code section almost meaningless.
"`We hold that the Company has the burden of clearly establishing from the record that the Commission's order is confiscatory in order to invoke this Court's independent review.
"`In St. Joseph Stock Yards Company v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936), Chief Justice Hughes, writing for the Court states:
"`"The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. (Citations omitted.) (at 53)." "`We agree with Chief Justice Hughes that confiscation must be clearly established by the complaining party in order to invoke a broader scope of review in utility rate cases. With this case we prospectively adopt the stricter standard, i.e., that confiscation must be clearly established by the utility in order to invoke the broader scope of review. (Emphasis added.)'
"Alabama Gas Corp., Id."
Continental Telephone v. Ala. Pub. Serv. Comm'n, 427 So.2d at 984-985.

III

DOES THE COMMISSION ORDER RESULT IN CONFISCATION OF CONTINENTAL PROPERTY IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND OF SECTIONS SIX AND THIRTEEN OF THE ALABAMA CONSTITUTION?
Continental claims that the final order of the Commission results in confiscation of its property. If shown, of course, confiscation of a public utility's property is violative of basic constitutional rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections Six and Thirteen of the Alabama Constitution. Alabama Pub. Serv. Comm'n v. Southern Bell, 253 Ala. 1, at 12-13, 42 So.2d 655, 663 (1949).
In determining whether confiscation is shown, we necessarily consider the elements of a rate case. In this connection, this Court has determined, "There is no way to determine whether a rate is fair, reasonable, and non-discriminatory except to examine the elements of which it is composed." Southern Bell, supra, 253 *1202 Ala. at 16, 42 So.2d at 666. More recently, the Court has stated that this review "must include an examination of all the elements of which it is composed." Alabama Power Co. v. Alabama Pub. Serv. Comm'n, 390 So.2d 1017, 1025 (Ala.1980) (emphasis added).
A rate case is composed of four essential elements: the rate base, capital structure, rate of return, and operating results. An analysis of the Commission's final order and the treatment of the elements of this rate case will indicate whether the order is unconstitutionally confiscatory, as alleged by Continental.

IV

SUMMARY OF ARGUMENT ON CONFISCATION
In its brief, and at oral argument, Continental called our attention to two principal areas wherein it says the Commission's order is confiscatory, viz.: "Inside Wire" and "Intrastate Toll Revenues."
These two issues were the only ones raised by Continental in its petition for reconsideration filed with the Commission.
In its brief, Continental summarized its argument on the adjustments involved in these two issues and other adjustments, as follows:
"(a) Inside Wire. Continental, in its initial filing of new rates, requested the Commission deregulate the installation, maintenance, and repair of inside wire. In calculating the new proposed rates, Continental eliminated all expenses and revenue relating to inside wire. The Commission Final Order denied Continental's request for deregulation of inside wire, but failed to restore to the calculation of operating income, the expenses and income related to inside wire. The revenue effect of such adjustment would be $364,021 and should be added to the rates allowed Continental in this case.
"The Attorney General agreed Continental is due $364,021 in additional revenues. See page 8, Brief of Attorney General in Opposition to Application for Supersedeas of Continental. The Public Staff, in its brief, did not dispute the Continental position on this issue.
"(b) Intrastate Toll Revenues. As a result of the breakup of AT & T, Continental now collects from AT & T, South Central Bell Telephone Company, and other interexchange carriers, access charges for the use by said carriers of Continental's system to carry toll (long distance) messages. The Continental access charges are based on Minutes of Use ("MOU") of the Continental system, multiplied by rates adopted by the Federal Communications Commission ("FCC") for interstate toll calls, and by the Commission for intrastate toll calls.
"In determining the intrastate toll revenues of Continental in this case, the Commission used 1983 data to estimate 1984 MOU, rather than the actual MOU measured and tabulated by Continental in 1984. Not only are the actual, measured 1984 MOU the most reliable evidence available, and the latest evidence available, but there is nothing in the record to suggest this actual 1984 data is not accurate.
"Indeed, the Public Staff, in its Cross-Petition for Reconsideration (Addendum Exhibit 15), states:
"`The Public Staff respectfully requests reconsideration of the Commission's usage of 1983 minutes of use, grown by 8%, rather than the annualized five months testimony, as a basis for calculating the Company's intrastate toll revenues. The Public Staff does not request reconsideration of the Commission's usage of the 95% SLU conversion factor.' (Emphasis supplied.)
"Accordingly, even the Public Staff agrees the Commission should have used the actual 1984 MOU. There is no dispute on this point and there simply is no basis for using MOU other than the 1984 MOU submitted by Mr. Yaconis, the Continental witness, as the basis for calculation of access charges in computing intrastate toll revenues.

*1203 "The second factor employed in calculating intrastate toll revenues are the rates to be applied to the intrastate MOU. Although the Public Staff, in its Cross-Petition for Reconsideration, requests the Commission employ rates different from the rates the Commission uses in the Commission Final Order, Continental agrees the setting of such rates is within the discretion of the Commission and does not here dispute the rates used by the Commission.
"If the same rates employed by the Commission in the Commission Final Order are applied to the 1984 MOU in the identical calculation appearing on page 75 of the Commission Final Order, see p. 75 of Addendum Exhibit 3, the result is an increase in revenues to Continental of $1,894,137 (Addendum Exhibit 4).
"Accordingly, the total increase in rates to Continental resulting solely from the two issues raised in the Petition for Reconsideration is $2,258,158.
"Thus, the case for confiscation is clearly based solely on these two issues.
"2. Issues Involving Remaining Adjustments To Rate Base and Operating Income, and Rate of Return.

"The five principal remaining issues are:
"(a) Adjustments to rate base required by attrition;
"(b) Adjustments to operating expense required by inflation;
"(c) Additional increases in adjustments made by the Commission for payroll and loss of terminal equipment to extend such adjustments prospectively for periods beyond the test year within which such adjustments are known and measurable;
"(d) Imputed interest on Job Development Investment Credit ("JDIC"); and
"(e) Return on equity and overall rate of return.
"(a) Attrition. Alabama requires Continental to use an original cost rate base when applying for a rate increase, § 37-1-80. The allowance by the Commission of a certain amount of revenue dollars, after adjustment for tax effect, when applied to the dollar amount of the original cost rate base, mathematically produces an overall rate of return expressed in terms of a percentage of rate base. As assets included in the rate base at a certain dollar figure are replaced with assets at a higher dollar figure, the same dollar amount of revenue allowed to be earned, when applied to the increased rate base, results in a lower percentage overall rate of return than authorized.
"The Continental attrition adjustment seeks to permit Continental to achieve the authorized percentage rate of return by increasing the rate base to reflect replacement of assets at a current cost higher than original cost.
"By ignoring the adjustment for attrition, the Commission fails to consider the future financial needs of Continental and makes inevitable frequent requests for increased rates.
"(b) Inflation. Continental requested an adjustment to operating expenses to reflect recent historical data on inflation. As stated above with respect to attrition, to ignore the reality of inflation simply invites frequent filings for increased utility rates.
"(c) Prospective Adjustments. In the last Continental case before this Court, Continental Tel. Co. of the South v. Alabama Pub. Serv. Comm'n, 427 So.2d 981, 990-91 (Ala.1982), this Court expressly and specifically instructed the Commission concerning adjustments for increases in payroll. Continental, in this case, followed precisely the guidelines of this Court concerning the adjustment to payroll expenses. Despite this Court's specific and express injunction, the Commission again refuses to accept the full payroll adjustment of Continental.
"The Commission not only refuses to extend the payroll adjustment for a period within which the adjustment is known and measurable, but also refuses to do likewise with respect to the adjustment *1204 allowed by the Commission for the loss of terminal equipment.
"(d) Imputed Interest on JDIC. The Commission, in a departure from prior practice, imputed a fictitious interest return on JDIC. The Commission specifically rejected this adjustment in the last, and all previous, rate cases of Continental. The adjustment is contrary to good accounting practice, to the consistent practice of the Commission, and jeopardizes Continental's right to claim JDIC.
"(e) Rate of Return. Both the return on equity, 14.65%, and the overall rate of return, 10.99%, allowed by the Commission, are below the lowest recommendations of expert witnesses of Continental and of the Public Staff (excluding consideration of double leverage which the Commission rejected). This Court should allow at least a 16% return on equity and an 11.3% overall rate of return."

V

WAS THERE CONFISCATION?
In order to determine whether confiscation occurred, we will address each issue as to which Continental claimed confiscation occurred.

INSIDE WIRE
As pointed out above, Continental claims that it requested the Commission to deregulate "inside wire," but that the Commission refused the request, and, in addition, failed "to restore to the calculation of operating income, the expenses and income related to inside wire."
The Public Staff, in its brief, does not specifically address the issue of the Commission's treatment of "inside wire."
The Attorney General, while stating in his brief on Continental's application for supersedeas that Continental appeared to be entitled to $364,021 in additional revenues, in his brief on the merits, argues:[3]
"There appears to be a general consensus of the parties that the Company should be allowed to recover all costs and expenses associated with the installation and repair of inside wire. At issue, therefore, is how that is to be accomplished. Continental seeks to recover the expenses as part of its general rate request. The Commission maintains that Continental should recover these expenses in the same manner as all other telephone companies through the filing of tariffs, as directed in Docket No. 18480 and the subsequent bulletin issued to all telephone companies in Alabama and their CPA's outlining procedures necessary to comply with Docket No. 18480."
The Commission makes a similar argument:
"(1) Inside Wiring: The Commission agrees that the Company should be allowed to recover all costs and expenses associated with the installation and repair of inside wiring, but the Commission expects the Company to recover these expenses from the services performed as previously ordered by the Commission.
"In APSC Docket No. 18480 the Commission gave each telephone company the flexibility to choose how expenses associated with the installation and repair of inside wiring are to be recovered, but CTCS-A chose not to file any tariffs to recover such expenses. A party should not be allowed to complain of possible injuries resulting from its willful failure to comply with the valid prior orders of the Commission.
"The Company proposed the elimination of all services for the maintenance and repair of inside wiring and alleged that the expenses associated with the installation and repair of inside wiring exceeded revenues from such services by $185,775 (Boccucci Exhibit, Schedule 1, Item 34). The Commission disallowed the deregulation or detariffing of the installation and repair of inside wiring and denied the elimination of nonrecurring *1205 service charges for such services. The Commission further found that the Company should recover all expenses arising from the installation and repair of inside wiring from the charges for such services.
"Applying the Company's tax factor of .510616 to the $185,775 income deficiency, results in an after tax revenue requirement of $363,825.
"The Company should file appropriate tariffs with the Commission to recover any net expenses associated with inside wiring in any of the following ways: (a) flat nonrecurring service charges, (b) time and material charges, (c) monthly optional maintenance program, or (d) any other reasonable method it may choose. The Company should not be allowed to recover these expenses from basic local service rates in contempt of the Commission's clear directives."
Although the Attorney General attaches a copy of the order issued in APSC Docket 18480 as an appendix in its brief, and the Commission, in its order, bases its decision on the requirements of the order in APSC Docket 18480, we fail to find any reference in the briefs or the Commission order to the portion of the record where this order is a part of the record in this case.
Continental, in its reply brief, states as follows:
"(a) Inside Wire. Both the Attorney General and the Commission refer to the Report and Order of the Commission in Docket No. 18480 (the "18480 Order"), which these parties contend require Continental to file a tariff to recover expenses incurred in connection with inside wire. This contention never has been raised before and is so removed from reality as to make a reply difficult...."
Continental does, in fact, then analyze the effect of the "18480 order" and argues that it is not applicable and that "[t]he Commission has never suggested, until the filing of the brief in this case, that Continental was not in compliance with the 18480 order or that Continental file any tariff regarding inside wire, nor is there a reference to a tariff filing in the 18480 order." Whether applicable or not, we are constrained to limit our review to the Commission order itself, which appears to have been based upon one of its prior orders which was not made a part of the proceeding then before it; therefore, based upon the evidence produced by Continental during the proceeding, we hold that the Commission erred in its treatment of the "inside wire" adjustment.
We find that Continental has shown that the final order of the Commission is confiscatory and that an amount of $185,875 must be deducted from net operating income and, after application of the retention factor of .510616, the amount of $364,021 must be added to the new rates allowed Continental in this case.

INSTRASTATE TOLL REVENUES
As previously pointed out, Continental claims that the portion of the Commission's final order with respect to intrastate toll revenues is erroneous because the Commission used 1983 data instead of 1984 data in computing the amount of revenue Continental would receive by means of "access charges," which mathematically are a product of the number of minutes of use (MOU) that Continental's telephone equipment is used in completing long distance calls and Continental's rate to the long distance carrier for the use of its facilities, this rate being called the common carrier line charge.
Continental challenges the Commission's computation of total test year MOU, contending that the Commission should have used a computation made by one of Continental's witnesses. In order to understand the Commission's computation of test year MOU, it is helpful to be familiar with the chronology of the testimony respecting this issue.
The question of estimated intrastate MOU first arose in a generic docket on access charges which the Commission instituted to permit all telephone companies operating in Alabama to put into place access *1206 charges to take effect on the divestiture of the Bell System so that these companies would continue to receive long distance revenues. Docket 18908. In that docket, in estimating its 1984 MOU for the purpose of establishing its access charges to take effect on January 1, 1984, Continental represented to the Commission that its estimated 1984 total intrastate minutes of use would be 136,417,104. (Commission Exhibit 32 in this case, Docket 18978.)
The company's initial witness on this subject in this case, Mr. Boccucci, presented an estimate which was lower than the company's estimate presented in the generic access charge docket, his estimate of 1984 total intrastate minutes of use in this docket being 127,369,509. Mr. Boccucci was unable to explain the differences between the Company's estimated 1984 minutes of use in docket 18908 and his estimate in the present docket, 18978, or to reconcile the two estimates.
The Governor's Staff's witness, Mr. Larkin, in computing the Company's estimated 1984 intrastate toll revenue, used the estimated 1984 minutes of use which the Company had presented in docket 18908, 136,417,104. Mr. Larkin used 136,417,104 because this number had been computed using the 1982 actual minutes of use increased by an estimated 8% rate of growth in intrastate long distance calling between 1982 and 1984, which Mr. Larkin stated was a reasonable growth estimate. In rebuttal, the Company presented the testimony of yet another witness, Mr. Yaconis, who claimed to have computed his estimate of 1984 intrastate toll revenue based on an annualization of actual MOU for the first five months of 1984, his estimate being 107,980,000. After filing his rebuttal testimony, Mr. Yaconis submitted a revision of his estimate of 1984 total intrastate MOU to 110,209,000. The parties disagree on the reason for the revision, but we find that this disagreement does not affect our treatment of the legal issue presented.
The Commission rejected all of the specific computations offered by the various witnesses, electing to utilize the 1983 actual minutes of use of 124,693,000 increased by 8% for estimated growth between 1983 and 1984 to 134,668,444. It is the Commission's use of the 1983 actual minutes of use increased by 8% for estimated growth rather than Mr. Yaconis's final estimate of 110,209,000 which Continental contests, alleging in its brief that "the latest data available should be employed in setting rates" and that "there is nothing in the record to suggest the actual 1984 Continental data on intrastate MOU is not accurate or unverifiable." It is the last stated contention that is at issue.
The Commission found:
"This Commission is not persuaded that the data presented by Mr. Yaconis as the actual first six-month access minutes of use is accurate or verifiable at this time period.
Mr. Yaconis substantially revised his testimony as recent [sic] as August 9, 1984. This Commission intends to use the most recent and reliable information available but we will not use data that is inaccurate or unverifiable."
The Public Staff takes the position that the Commission's rejection of the Company's 1984 actual experience was "reasonable." Continental says this position is contrary to the one taken by the Public Staff earlier. Continental argues:
"We repeat the statement of the Public Staff in its cross-petition for reconsideration (Addendum Exhibit 15):
"`The Public Staff respectfully requests reconsideration of the Commission's usage of 1983 minutes of use, grown by 8%, rather than the annualized five months of actual 1984 minutes of use presented in Mr. Yaconis' rebuttal testimony, as a basis for calculating the Company's intrastate toll revenues. The Public Staff does not request reconsideration of the Commission's usage of the 95% SLU conversion factor.'
"The Governor now sees fit to retreat, without explanation, from this statement in the Cross-Petition for Reconsideration adopting the actual 1984 minutes of use *1207 presented in Mr. Yaconis' rebuttal testimony, as suggested by Continental. The Governor should not be permitted to ignore this position adopted in a formal pleading filed with the Commission."
The principal argument of the Governor and the Attorney General is that Continental substantially changed its estimates during this proceeding, and in hearings specifically set by the Commission to consider access charges in Docket 18908. Continental answers these arguments, as follows:
"The first estimate of MOU submitted by Continental was in December, 1983, in Docket No. 18908, prior to the date on which actual MOU commenced to be compiled by Continental. The estimate given in Docket No. 18908 was based on calendar year 1982. These same MOU submitted in Docket No. 18908 were used by Mr. Boccucci in the prepared testimony submitted in this rate case. The only reason the estimated MOU are different in Docket No. 18908 and in this rate case is that the MOU employed in Docket No. 18908 were for the calendar year 1984 based on calendar year 1982 and Mr. Boccucci adjusted such MOU to the test year ended September 30, 1983. Accordingly, contrary to the assertions of the Governor and the Attorney General, there was no change in the estimated minutes between the Continental testimony in Docket No. 18908 and the Boccucci testimony in this rate case.
"The first change in the MOU estimate occurred when Mr. Yaconis testified in rebuttal testimony in this case as to the actual MOU tabulated by Continental from January through May 1984, which was the first period during which actual MOU were tabulated. This tabulation provided the basis for the estimate of 107,980,000, composed of 26,305,000 interlata MOU and 81,675,000 intralata MOU for calendar year 1984 (Addendum Exhibit 6). It is this estimate of Mr. Yaconis that the Governor urged the Commission to adopt in the Governor's cross-petition for reconsideration. The calendar 1984 MOU of 107,980,000 was reduced to 101,663,000 to coincide with the test year ended September 30, 1983.

"Mr. Yaconis, in a later hearing held on August 13, 1984, in Docket No. 18908, revised the 107,980,000 to 110,209,000 because Continental had tabulated an additional month, the month of June, of actual minutes, and not because of any mistake or misconception of the Continental staff, as alleged by the Governor. The change in the estimate was solely a result of having one additional month's data.
"On November 15, 1984, data for the eight months ended August 31, 1984, was tabulated and Mr. Yaconis submitted the most recent estimate of 107,113,593 MOU, within one percent of the 107,980,000 MOU submitted in the rate case which was based on five months' data.
"Accordingly, only two changes have been made in the estimates of MOU for calendar year 1984 based on the actual MOU tabulated by Continental, the first change being from 107,980,000 to 110,209,000, a change based on six months' rather than five months' data, and the second change based on eight months' data, being from 107,980,000 to 107,113,593. Accordingly, the evidence in this case is the 107,980,000 MOU, adjusted to 101,663,000 for the test year, and is the only credible evidence in this case as to the MOU to be employed in calculating intrastate toll revenues for the test year."
The Commission argues that "any consideration of access charge rates has been separated into a separate inquiry [Docket 18908] and any further consideration of such rates should be addressed in that case."
We first address the principal question presented to us, and that is whether the following finding by the Commission is erroneous:
"This Commission is not persuaded that the data presented by Mr. Yaconis as the actual first six month access minutes of use is accurate or verifiable at this time. Mr. Yaconis substantially revised his testimony *1208 as recent [sic] as August 9, 1984. This Commission intends to use the most recent and reliable information available, but we will not use data that is inaccurate or unverifiable. It is unfortunate that the implementation of divestiture and the FCC's access charge plan have created such confusion in the regulatory process."
Like the Commission, we are aware that because of the implementation of divestiture and the FCC charge plan the Commission has a difficult job in setting rates which are reasonable and fair, as mandated by the Code of Alabama, but the Commission, and this Court, must deal with the realities of divestiture in the telecommunications industry.
The Commission found that the testimony of Mr. Yaconis regarding the 1984 MOU was inaccurate. We do not find that determination substantiated in the record. The Public Staff and the Attorney General attempt to uphold the finding by claiming that prior estimates of MOU by the company itself showed the inaccuracy of the 1984 actual data. Logical reasoning would say that proof of an actual amount would not be shown to be inaccurate by proof that prior estimates were different from the actual results. Consequently, we cannot agree with the Commission's finding on MOU. The Commission's other finding that any revenue deficiency caused by its finding could be adjusted in a pending docket should not prevent the recovery of this revenue deficiency in the subject docket. In General Tel. Co. of the Southeast v. Alabama Pub. Serv. Comm'n, 335 So.2d 151, 158, 159 (Ala. 1976), this Court said that "[E]laborate calculations which are at war with realities are of no avail," and that "The law is well-settled that the Commission may not rely upon a reckoning when actual experience is available and establishes that the predictions have been substantially incorrect," and further that "To prefer the forecast to the survey is an arbitrary judgment." As the Commission pointed out, and as we are aware, divestiture had a tremendous impact on the telecommunications industry; therefore, the principles above enunciated regarding forecasts and actual experiences take on added significance, especially during the phase-in of divestiture. We hold, therefore, that the Commission order with regard to intrastate toll charges can be handled in those proceedings. "If rates are prospective, they must correspond to the actual needs of the company during the time they are in effect." Continental Telephone Co. of the South v. Alabama Pub. Serv. Comm'n, 427 So.2d 981, 991 (Ala.1982). If the "actual" data is flawed because it was annualized based on only six months of experience, this fact could be the subject of a special hearing after remand. Cf. General Tel. Co. of the Southeast v. Alabama Pub. Serv. Comm'n, supra.

VI

ISSUES INVOLVING REMAINING ADJUSTMENTS TO RATE BASE AND OPERATING INCOME, AND RATE OF RETURN
The Company, although relying on the foregoing two principal issues, nevertheless, argues that several other adjustments to the rate base and operating income resulted in confiscation. We will address each issue separately.

ATTRITION
Continental claims that its earnings are being eroded because it is adding new investments at unit costs in excess of average unit costs. The Company argues:
"In In re Arizona Public Service Co., 38 PUR 4th 547 (1980), the Arizona Corporation Commission, in considering Arizona Public Service Company's request for a rate increase, recognized the effect attrition has on a company's earnings. The Commission said:
"`The various aspects of ratemaking can be reduced to one degree or another to assumptions from which rational calculations can be made. A substantial controversy surrounds the issue of *1209 attrition and its treatment in this case. On one item, and only one item, does there appear to be no controversy. Attrition does exist. In essence, company earnings are subject to erosion over time. While the effect of this [phenomenon] may be minimal in some and possibly even most utility operations, the impact of attrition on a billion dollar plus company can be sizable. Earnings are based upon a test period which, though it be adjusted and modified, is still to some extent a model based upon a past period with historical costs and revenues. Time does elapse from the end of that period and those calculations until the entry of an order by the Commission. Over that period of time any rate of return set by the Commission on the test period will erode. To what degree is a difficult question.'
38 PUR 4th at 556.
"The Arizona Corporation Commission concluded the appropriate method to use to adjust for attrition was to quantify the historical effect of attrition and use this information in determining what rates the company may charge. The Arizona Corporation Commission said the inclusion of this factor in determining what rates the company may charge `does not result in prospective rate making or speculative rate making. Quite to the contrary, by use of this approach, the Commission is attempting to evaluate, and compensate for, a very real phenomenon.' 38 PUR 4th at 557.
"Several jurisdictions require their regulatory commissions to consider the factors of attrition and erosion in rate making. See New England Tel. and Tel. Co. v. State, 113 N.H. 92, 302 A.2d 814 (1973); Potomac Electric Power Co. v. Public Serv. Comm'n, 380 A.2d 126 (D.C.App.1977); Boston Gas Co. v. Department of Pub. Util., 359 Mass. 292, 269 N.E.2d 248 (1971).
"As the New Hampshire Supreme Court stated in New England Tel. and Tel. Co. v. State, 113 N.H. 92, 302 A.2d 814 (1973): `If the existence of attrition can be established by the company, the commission should evaluate the impact of this factor on the earnings of the utility and make an appropriate allowance.' 302 A.2d at 818.
"Alabama requires companies use an original cost rate base when applying for a rate increase. The Oklahoma Supreme Court in Lone Star Gas Co. v. Corporation Commission of Oklahoma, 648 P.2d 36 (1982), commented on attrition adjustments in cases where original cost rate bases were employed as follows:
"`An attrition adjustment would seem to be especially important when the Commission in this case used an original cost rate base in a period of inflation.
We therefore hold that the Commission's failure to consider the effects of attrition, erosion and regulatory lag (especially when coupled with its use of an exclusively original cost rate base and taking into consideration the undisputable fact of inflation and the uncontroverted evidence) is an additional reason requiring reversal of the Commission's order....'
"648 P.2d at 41."
The Commission and the Attorney General counter that the traditional use of the "test year" is reasonable and takes into account known and measurable changes in the company's rate base. The Public Staff takes the position that "an attrition adjustment, such as the company has proposed, which projects plans into the future, is in direct contradiction to the mandate set out by our legislature in the 1978 amendment to § 37-1-80, Code of Alabama (1975), as amended." The Public Staff argues:
"Under the old law, a company was permitted to earn a return on both existing plant and `the amount of new investment to be added in the year immediately following the test period....' In 1978, the legislature specifically deleted the provision for new investment acquired following the test year. Thus, it is clear *1210 that our law no longer allows a return on plant projections as the Company has proposed. Had the Company simply read the recent Code enactment, much time and effort could have been spent, instead, concentrating on adjustments that are at least arguably within the confines of the law.
"Beyond the Company's failure to update its legal research on this point is the fact that its attrition adjustment, extending seventeen months outside the test period, would not have been allowed even under the old law, as it extended five months beyond the `year' time limit specified therein.
"The Commission correctly applied the Alabama law, as mandated in our Code, by disallowing the Company's projections for plant, which are in clear disregard of Section 37-1-80, as amended.
"The Commission's Order is due to be upheld in its denial of the attrition adjustment."
While we find that the Company has not shown error in this case, we do not agree that the Commission cannot, or should not, consider an adjustment for attrition, if shown by the proof offered. Code 1975, § 37-1-80, even as amended, still states as follows:
"In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration among other things to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service." (Emphasis added.)
If a utility can show that it is managing the business of the company honestly, efficiently, and economically, or stated differently, that there is no showing of poor and uneconomical management, and can show that it needs to enlarge its plants, facilities, or equipment in order to "provide ... adequate service," then in determining a just rate of return the Commission "shall give due consideration" to those requirements. Code 1975, § 37-1-80. Having said this, however, we do not find that the Commission erred in this case in finding that the forecast adjustments were not verifiable; consequently, we affirm the final order of the Commission disallowing an adjustment for attrition. By affirming the order of the Commission, however, we do not hold that attrition will not occur. If it does, the Company can file a new request with the Commission, which it has done. If the Commission prefers to have periodic hearings, with their consequent cost and expense, which ends up costing ratepayers and the public at large, then that is a legislative choice.

INFLATION
During oral argument on the Company's request for supersedeas, counsel for the Company told us that "inflation is the principal reason we are here" and asked that we allow an adjustment for inflation or the Company would be back "next year." As we have already pointed out, the Company has already filed a new rate request with the Commission; therefore, the Company has fulfilled its forecast. The Company, on this appeal, asks us to adopt the reasoning of the Oklahoma Supreme Court in Lone Star Gas Co. v. Corporation Comm'n of Oklahoma, 648 P.2d 36 (Okla.1982), on the question of attrition and inflation.
In Lone Star, a natural gas utility appealed from an order of the corporation commission which had denied its request for a rate increase. The Court addressed the issues of attrition, inflation, and regulatory lag, as follows:
"The Commission presented no contrary evidence and admitted that no adjustment was made for inflation, attrition, erosion or regulatory lag. Instead the Commission's staff stated that the effects of inflation were built into the test year. The effects of past inflation, although built into the test year, will only balance out so long as revenues and *1211 expenses are rising in the same proportion. This balancing cannot reasonably be expected to occur when inflation continues after the test year. See South Central Bell Telephone Company v. Louisiana Public Service Commission, 352 So.2d 964, 975-76 (La.1977), cert. denied 437 U.S. 911, 98 S.Ct. 3103, 57 L.Ed.2d 1142. The testimony of Lone Star reflects that the increase in operating expenses and costs was exceeding the increase of operating revenues.
"Other jurisdictions require regulatory commissions to give substantial consideration to attrition, erosion and regulatory lag. New England Telephone and Tel. Co. v. State, 113 N.H. 92, 302 A.2d 814 (1973); Potomac Electric Power Company v. Public Service Commission, 380 A.2d 126 (D.C.App.1977); Boston Gas Company v. Department of Public Utilities, 359 Mass. 292, 269 N.E.2d 248 (1971); South Central Bell Telephone Company v. Public Utilities Commission, Tenn.App., 579 S.W.2d 429 (1979). As the New Hampshire Supreme Court stated in New England Telephone and Tel. Co. v. State, supra:
"`If the existence of attrition can be established by the company, the commission should evaluate the impact of this factor on the earnings of the utility and make an appropriate allowance.' 302 A.2d 818.
"An attrition adjustment would seem to be especially important when the Commission in this case used an original cost rate base in a period of inflation. We therefore hold that the Commission's failure to consider the effects of attrition, erosion and regulatory lag (especially when coupled with its use of an exclusively original cost rate base and taking into consideration the indisputable fact of inflation and the uncontroverted evidence) is an additional reason requiring reversal of the Commission's order and we remand this aspect of the case to the Commission for further consideration and action."
We could, of course, reach a similar result in this case, but we do not, because the aggrieved Company can, as many other utilities have during the past two decades, file repeated requests with the Commission for rate relief, and, thereby cut down some on regulatory lag.
As we stated earlier, we are not holding that the Company will not suffer increased expenses, only that we do not feel compelled, especially in view of the separation of powers doctrine, to usurp the powers of the Commission as the ratemaking agency. Furthermore, there is an obligation, spelled out in our rate-making statutes, that utilities should operate honestly, efficiently, and economically. Code 1975, § 37-1-80. For us to require the Commission to make an adjustment for inflation automatically would not encourage utilities to take positive steps to reduce and minimize expenses to deal with the problem of inflation.

PAYROLL ADJUSTMENTS
The Company proposed certain adjustments to test year payroll expenses. The Commission allowed an adjustment for the 1984 wage increases, but denied an adjustment for proposed wage and salary increases for non-union and management employees for 1985. In Alabama Gas Corp. v. Alabama Public Service Comm'n, 425 So.2d 430 (Ala.1982), this Court held at 435:
"While the circumstances of each case may vary so as to require a flexible rule, under the facts of this case, the six month post-test period is arbitrary and capricious. We therefore hold that the Commission's order setting a six-month post-test period is unreasonable under the facts of this case."
We recognize that the circumstances of each case can vary, but there is no measurable difference in the circumstances of this case and those of the last Continental appeal. We hold, therefore, that the Commission erred in disallowing Continental's proposed adjustment for payroll expenses.

TERMINAL EQUIPMENT REVENUE
Continental made two separate and distinct adjustments to the September 1983 *1212 annualized revenue generated from customer premises equipment ("CPE"). These adjustments reflect (1) the anticipated continued erosion of the terminal equipment lease base, and (2) the anticipated effect of Continental's aggressive single line set sales plan.
The Commission rejected the second adjustment based on the proposed sales plan, and Continental did not appeal this action of the Commission.
The Commission accepted the first Continental adjustment, but limited the adjustment to April 1984. Continental claims that the Commission should have carried the adjustment through February 1985, the midpoint of the first year of new rates, arguing that since the CPE marketplace was opened to competitive supply, Continental has suffered significant customer migration away from Continental-provided leased terminal equipment and a corresponding erosion of revenue derived from that terminal equipment.
We cannot say the Commission erred in disallowing an adjustment for CPE to reflect the alleged "expected level of CPE revenue in the first year of new rates"; therefore, the Commission's order is due to be affirmed in this respect. As pointed out earlier, the Company has filed a new rate proceeding. Actual experience under this rate order will be available in that proceeding. Experience may, or may not, show the Company's projections were accurate, but we cannot, pursuant to our scope of review, overturn the Commission's finding.

IMPUTED INTEREST ON JDIC
The Commission entered the following order in connection with the item "Imputed Interest on JDIC":
"The Commission has previously recognized the need to synchronize the interest level actually provided for in the overall return granted the Company with the tax expense recognized in the Company's cost of service (net operating income). If the Company's income requirement embraces a certain level of debt (interest) then fairness demands, at a minimum, that the same level of debt cost (interest) be used in computing the Company's tax expense. To make the ratepayer pay all of the debt cost (interest) included in the capital structure, and yet fail to factor in the savings in the expense commensurate with the allowed debt cost (interest) included in the capital structure, would be inequitable and violative of our legislative mandate under Ala.Code § 37-1-80 (1975) to insure that the rates are just to both the utility and the public."
The Attorney General, in his brief, states the purpose of the Commission's order, as follows:
"To account for the income tax effect of debt is to recognize for rate making purposes that the cost of debt, or interest, is an expense deductible for income tax purposes. Therefore, the interest, or cost of debt in the capital structure, is synchronized with the interest expense for income tax purposes in order to flow this tax benefit, or recognized interest deduction, to the ratepayer. In short, to assure the cost of debt borne by the ratepayer is the after-tax cost of debt."
In its brief, the Commission recognizes that "[t]here is substantial dispute as to whether the interest synchronization methodology utilized by the Commission (re: leaving JDIC in the rate base for the purpose of computing interest synchronization) violated the provisions of Internal Revenue Code § 46," but the Commission claims that several regulatory bodies and courts have included JDIC in the interest synchronization adjustment "with apparently no negative tax consequences to the utilities involved."
The Company, of course, says that if the order stands, "it is clear that the Internal Revenue Service will disallow the investment tax credit, thus costing the customers of Continental substantial sums of money."
In its brief, Continental argues:
"SEC. 46(f)(2) of the Internal Revenue Code of 1954 (`Code') provides that no *1213 investment tax credit (JDIC) shall be allowed if:
"`the taxpayer's cost of service for ratemaking purposes ... is reduced by more than a ratable portion of the credit....'
"The term `cost of service' is defined in Treas.Reg. § 1.46-6(b)(2):
"`[T]he amount required by a taxpayer to provide regulated goods or service. Cost of service includes ... tax expenses....'
"Treas.Reg. § 1.46-2(b)(2)(ii) states that a lowering of federal income tax expense attributable to the treatment of JDIC by regulatory agencies would constitute a proscribed reduction in cost of service:
"`In determining whether, or to what extent, a credit has been used to reduce cost of service, reference shall be made to any accounting treatment that affects cost of service. Examples of such treatment include reducing by all or a portion of the credit the amount of federal income tax expense taken into account for ratemaking purposes....' [Emphasis supplied].
"Treas.Reg. § 46-6(b)(4)(1) also supports the conclusion that cost of service has been reduced in contravention of the Code. The section describes impermissible indirect reductions in cost of service in providing:
"`[C]ost of service ... is also considered to have been reduced by reason of all or a portion of a credit if such reduction is made in an indirect manner.
"`(ii) One type of such an indirect reduction is any ratemaking decision in which the credit is treated ... as capital provided by anyone other than common shareholders. [Emphasis supplied].'
"By computing a fixed charge on JDIC, JDIC is treated as capital provided by a creditor, not a common shareholder. North Carolina ex rel. Util. Comm'n v. Carolina Tel. and Tel. Co., 51 PUR 4th 457 (1983)."
Continental also claims that the Commission's method of treating JDIC is inconsistent with past Commission practices, and jeopardizes its ability to take JDIC in the future. Because the Commission itself recognizes that "[t]here is a substantial dispute" whether its treatment of JDIC violates the Internal Revenue Code, we are constrained to hold that the Commission's order is erroneous. We addressed this issue in Continental's last rate appeal, as follows: "[W]hile stare decisis does not apply to decisions of administrative agencies such as the Public Service Commission, consistency is essential if arbitrariness is to be avoided." Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 427 So.2d 981, 993 (Ala.1982).

RATE OF RETURN
Continental claims that the evidence does not support an award of less than 16% on equity and 11.3% on overall rate of return. We disagree. We believe that the Commission's finding that Continental was entitled to a return on common equity of 14.65% and an overall rate of return of 10.99% is reasonable. We are not convinced, however, that the order entered by the Commission will produce these rates of return.
In response to our order on supersedeas, the Company has filed three separate reports which the Company claims represents the actual experience of the Company under supersedeas. These reports are attached as appendices A, B, C, D, E, and F to this opinion. Of course, these reports are not part of the record in this case, and the opposing parties have not had an opportunity to cross-examine witnesses who prepared the reports or to verify them from the Company records. Nevertheless, if the reports accurately reflect current experience of the Company, we are faced with a situation similar to that which we faced in General Tel. Co. of the Southeast v. Alabama Pub. Serv. Comm'n, 335 So.2d 151 (Ala.1976). There, this Court, faced with *1214 conflicting evidence based upon the same record, determined that actual experience under the order would be the best evidence. In the General Telephone case, we said we would remand a case when we found it "expedient" to do so.
The Commission, on remand, is instructed to reopen the hearing within 60 days after receipt of the certificate of judgment of this Court for the purposes of making the determinations we have set out in this opinion. In the meantime, the supersedeas order made in this Court, and the bonds given pursuant thereto, shall remain and continue in full force and effect until final disposition of this cause. General Tel. Co. of the Southeast v. Alabama Public Service Comm'n, supra.
On remand, the Commission can consider, as it did in General Telephone, whether the actual experience of Continental produced the rate of return which the Commission itself found to be "reasonable." Because we hold that the Public Staff should not have participated in the proceedings, the Commission is directed on remand to exclude all evidence and arguments of the Public Staff, and to determine, without reference to that evidence or those arguments, whether Continental is entitled to receive revenues in addition to those allowed, but in no event to exceed an amount of revenue necessary to produce a reasonable rate of return.

VII

THE CROSS-APPEAL
The Governor's Public Staff for Utility Consumer Protection filed a cross-appeal and alleged that the Commission's final order contained mathematical and legal errors, which the Public Staff claims, if corrected, would reduce the Company's revenue requirement by $690,212, creating a revenue excess of $322,860.
Specifically, the Public Staff contends that the Commission erred in computing the rate base interest synchronization adjustment, and failed to consider evidence which showed Continental received more revenue than the Commission found was received during the test period attributable to the interestate phase-out of "customer premise equipment."
Because of our holding on the "due process" claim, we refuse to consider the Public Staff's cross-appeal.

VIII

CONCLUSION
We are aware that the divestiture of AT & T has had a tremendous impact on the telecommunications industry and that regulatory agencies such as the APSC and the various telephone companies have had to live through a period of some uncertainty because of the divestiture. Hopefully, time will help to settle some of the uncertainties in the industry.
The policy of the legislature, and the constitutions of both the federal and state governments, provide that when a company's property is devoted to public use, the Company is entitled to a fair rate of return. Although there have been disagreements over the years on the question of what is a fair rate of return, most appeals in rate cases have involved complex accounting adjustments and approximations on which conclusions by experts have differed, and this Court has been called upon to resolve the disputes.
As this Court said in General Tel. Co. of the Southeast v. Alabama Pub. Serv. Comm'n, supra, at 156:
"`The ultimate question in a rate case is a fair rate of return from a predetermined rate base....
"`"What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation, about which conclusions may differ...."'" (Quoting from State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975)).
As we view the law, a utility is under a duty to provide adequate service to the public; it is to manage its business honestly, efficiently, and economically. If the *1215 company performs these functions, it is entitled to a rate of return which will be fair to it and fair to the consuming public.
Those basic, simple rules should govern the Commission, the parties, and this Court, as we carry out our responsibilities under the laws and constitutions to which we are all bound.
83-1419 AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.
84-48 AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
*1216 APPENDIX A

 CONTINENTAL TELEPHONE COMPANY OF THE SOUTH ALABAMA
 Report to the Supreme Court of Alabama
 ASPC Docket No. 18978
 Per Books Effect of Supersedeas Effect of Full
 Per Granted Supersedeas 
 November December January Books
 1984 1984 1985 Total Intrastate Increase Adjusted Increase Adjusted 
Revenue
 Local Service $ 1,632,585 $ 1,572,440 $ 1,583,450 $ 4,788,475 $ 4,788,475 $393,340(A) $ 5,181,815 $1,566,656(B) $ 6,345,131
 Network Access 1,740,234 2,135,009 1,770,883 5,646,126 2,741,383 2,741,383 2,741,383
 Miscellaneous 100,808 161,260 112,321 374,389 368,296 368,296 368,296
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total $ 3,473,627 $ 3,868,709 $ 3,466,654 $10,808,990 $ 7,898,154 $393,340 $ 8,291,494 $1,556,656 $ 9,454,810
 Uncollectible Revenue 15,978 26,842 25,237 68,057 68,057 626 68,683 2,477 70,534
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Revenue $ 3,457,649 $ 3,841,867 $ 3,441,417 $10,740,933 $ 7,830,097 $392,714 $ 8,222,811 $1,554,179 $ 9,384,276
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
Expenses
 Maintenance $ 711,816 $ 894,854 $ 889,433 $ 2,496,103 $ 1,955,697 $ 1,955,697 $ 1,955,697
 Depreciation 681,806 694,194 706,397 $ 2,082,397 1,636,556 1,636,556 1,636,556
 Traffic 99,045 104,664 86,373 290,082 209,120 209,120 209,120
 Commercial 189,705 186,546 232,979 609,230 509,804 509,804 509,804
 General Office Salaries & Expense 306,410 510,553 327,570 1,144,533 901,366 901,366 901,366
 Other Operating 388,964 890,662 303,758 1,583,384 1,235,518 1,235,518 1,235,518
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total Operating Expenses $ 2,377,746 $ 3,281,473 $ 2,546,510 $ 8,205,729 $ 6,448,061 $ 6,448,061 $ 6,448,061
 ----------- ----------- ----------- ----------- ----------- ----------- -----------
Taxes
 Other Operating Taxes $ 193,016 $ 150,000 $ 248,064 $ 591,080 $ 505,203 $ 9,818 $ 515,021 $ 38,854 $ 544,057
 State Income Tax 15,935 17,601 45,222 78,758 35,520 10,583 46,103 41,884 77,404
 Federal Income Tax 194,712 37,979 72,945 305,636 137,842 171,264 309,106 677,783 815,625
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Taxes $ 403,663 $ 205,580 $ 366,231 $ 975,474 $ 678,565 $191,665 $ 870,230 $ 758,521 $ 1,437,086
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
 Net Operating Income $ 676,240 $ 354,814 $ 528,676 $ 1,559,730 $ 703,471 $201,049 $ 904,520 $ 795,658 $ 1,499,129
Other Income (46,371) 23,733 (35,410) (58,008) (26,162) (26,162) (26,162)
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Income Before Fixed Charges $ 629,869 $ 378,587 $ 493,266 $ 1,501,722 $ 677,309 $201,049 $ 878,358 $ 795,658 $ 1,472,967
Fixed Income 319,405 340,065 357,934 1,017,404 811,685 811,685 811,685
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Income $ 310,464 $ 38,522 $ 135,332 $ 484,318 $ (134,376) $201,049 $ 66,673 $ 795,658 $ 661,282
 =========== =========== =========== =========== =========== ======== =========== ========== ===========
Equity $37,574,892 $37,688,596 $37,703,230 $37,655,573 $30,041,616 $30,041,616 $30,041,616
 =========== =========== =========== =========== =========== =========== ===========
Return on Equity (Annual Level) (1.79)% .89% 8.80%
 =========== =========== ===========
(A) Supersedeas Revenue Granted $1,573,359 ÷ 4
(B) Supersedeas Revenue Requested $6,226,624 ÷ 4
Note: Actual Intrastate Minutes of Use for the twelve months ended December 31, 1984 were as follows:
 Interlata 25,348,609
 Intralata 80,695,735
 ___________
 106,044,344
 ===========

*1217 APPENDIX B

 CONTINENTAL TELEPHONE COMPANY OF THE SOUTHALABAMA
 Report to the Supreme Court of Alabama
 ASPC Docket No. 18978
 Per Books Effect of Supersedeas Effect of Full
 Per Granted Supersedeas 
 December January February Books
 1984 1985 1985 Total Intrastate Increase Adjusted Increase Adjusted
Revenue
 Local Service $ 1,572,440 $ 1,583,450 $ 1,691,282 $ 4,847,172 $ 4,847,172 $393,340(A) $ 5,240,512 $1,556,656(B) $ 6,403,828
 Network Access 2,135,009 1,770,883 1,705,083 5,610,975 2,748,663 2,748,663 2,748,663
 Miscellaneous 161,260 112,321 125,527 399,108 391,578 391,578 391,578
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total $ 3,868,709 $ 3,466,654 $ 3,521,892 $10,857,255 $ 7,987,413 $393,340 $ 8,380,753 $1,556,656 $ 9,544,069
 Uncollectible Revenue 26,842 25,237 22,989 75,068 75,068 626 75,694 2,477 77,545
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Revenue $ 3,841,867 $ 3,441,417 $ 3,498,903 $10,782,187 $ 7,912,345 $392,714 $ 8,305,059 $1,554,179 $ 9,466,524
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
Expenses
 Maintenance $ 894,854 $ 889,433 $ 633,947 $ 2,418,234 $ 1,894,686 $ 1,894,686 $ 1,894,686
 Depreciation 694,194 706,397 745,577 2,146,168 1,686,673 1,686,673 1,686,673
 Traffic 104,664 86,373 46,997 238,034 171,599 171,599 171,599
 Commercial 186,546 232,979 162,466 581,991 487,010 487,010 487,010
 General Office Salaries & Expense 510,553 327,570 308,557 1,146,680 902,842 902,842 902,842
 Other Operating 890,662 303,758 281,721 1,476,141 1,151,833 1,151,833 1,151,833
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total Operating Expenses $ 3,281,473 $ 2,546,510 $ 2,179,265 $ 8,007,248 $ 6,294,643 $ 6,294,643 $ 6,294,643
 ----------- ----------- ----------- ----------- ----------- ----------- -----------
Taxes
 Other Operating Taxes $ 150,000 $ 248,064 $ 226,203 $ 624,267 $ 531,095 $ 9,818 $ 540,913 $ 38,854 $ 569,949
 State Income Tax 17,601 45,222 24,305 87,128 44,017 10,583 54,600 41,884 85,901
 Federal Income Tax 37,979 72,945 297,396 408,320 206,283 171,264 377,547 677,783 884,066
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Taxes $ 205,580 $ 366,231 $ 547,904 $ 1,119,715 $ 781,395 $191,665 $ 973,060 $ 758,521 $ 1,539,916
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Operating Income $ 354,814 $ 528,676 $ 771,734 $ 1,655,224 $ 836,307 $201,049 $ 1,037,356 $ 795,658 $ 1,631,965
Other Income 23,773 (35,410) (30,093) (41,730) (21,082) (21,082) (21,082)
 ___________ ___________ ___________ ___________ ___________ _________ ___________ ___________ ___________
 Net Income Before Fixed Charges $ 378,587 $ 493,266 $ 741,641 $ 1,613,494 $ 815,225 $201,049 $ 1,016,274 $ 795,658 $ 1,610,883
Fixed Charges 340,065 357,934 352,139 1,050,138 837,800 837,800 837,800
 ___________ ___________ ___________ ___________ ____________ ________ ___________ __________ __________
 Net Income $ 38,522 $ 135,332 $ 389,502 $ 563,356 $ (22,575) $201,049 $ 178,474 $ 795,658 $ 773,083
 =========== =========== =========== =========== =========== ======== =========== ========== ===========
Equity $37,600,596 $37,703,230 $38,080,057 $37,794,628 $30,152,554 $30,152,554 $30,152,554
 =========== =========== =========== =========== =========== =========== ===========
Return on Equity (Annual Level) (0.30)% 2.37% 10.26%
 =========== =========== ===========
(A) Supersedeas Revenue Granted $1,573,359 ÷ 4
(B) Supersedeas Revenue Requested $6,226,624 ÷ 4
Note: Actual Intrastate Minutes of Use for the twelve months ended December 31, 1984 were as follows:
 Interlata 25,348,609
 Intralata 80,695,735
 ___________
 106,044,344
 ===========

*1218 APPENDIX C

 CONTINENTAL TELEPHONE COMPANY OF THE SOUTHALABAMA
 Report to the Supreme Court of Alabama
 ASPC Docket No. 18978
 Per Books Effect of Supersedeas Effect of Full
 Per Granted Supersedeas 
 January February March Books
 1985 1985 1985 Total Intrastate Increase Adjusted Increase Adjusted 
Revenue
 Local Service $ 1,583,450 $ 1,691,282 $ 1,611,691 $ 4,886,423 $ 4,886,423 $393,340(A) $ 5,279,763 $1,556,656(B) $ 6,443,079
 Network Access 1,770,883 1,705,083 1,646,337 5,122,303 2,783,986 2,783,986 2,783,986
 Miscellaneous 112,321 125,527 124,739 362,587 354,245 354,245 354,245
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total $ 3,466,654 $ 3,521,892 $ 3,382,767 $10,371,313 $ 8,024,654 $393,340 $ 8,417,994 $1,556,656 $ 9,581,310
 Uncollectible Revenue 25,237 22,989 22,496 70,722 70,722 626 71,348 2,477 73,199
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Revenue $ 3,441,417 $ 3,498,903 $ 3,360,271 $10,300,591 $ 7,953,932 $392,714 $ 8,346,646 $1,554,179 $ 9,508,111
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
Expenses
 Maintenance $ 889,433 $ 633,947 $ 701,170 $ 2,224,550 $ 1,742,935 $ 1,742,935 $ 1,742,935
 Depreciation 706,397 745,577 732,393 2,184,367 1,716,694 1,716,694 1,716,694
 Traffic 86,373 46,997 127,889 261,259 188,342 188,342 188,342
 Commercial 232,979 162,466 178,924 574,369 480,632 480,632 480,632
 General Office Salaries & Expense 327,570 308,557 290,209 926,336 726,639 726,639 726,639
 Other Operating 303,758 281,721 394,245 979,724 762,454 762,454 762,454
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total Operating Expenses $ 2,546,510 $ 2,179,265 $ 2,424,830 $ 7,150,605 $ 5,617,696 $ 5,617,696 $ 5,617,696
 ----------- ----------- ----------- ----------- ----------- ----------- -----------
Taxes
 Other Operating Taxes $ 248,064 $ 226,203 $ 222,976 $ 697,243 $ 588,308 $ 9,818 $ 598,126 $ 38,854 $ 627,162
 State Income Tax 45,222 24,305 29,279 98,806 70,409 10,583 80,992 41,884 112,293
 Federal Income Tax 72,945 297,396 92,310 462,651 329,685 171,264 500,949 677,783 1,007,468
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Taxes $ 366,231 $ 547,904 $ 344,565 $ 1,258,700 $ 988,402 $191,665 $ 1,180,067 $ 758,521 $ 1,746,923
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
 Net Operating Income $ 528,676 $ 771,734 $ 590,876 $ 1,891,286 $ 1,347,834 $201,049 $ 1,548,883 $ 795,658 $ 2,143,492
Other Income (35,410) (30,093) 5,928 (59,575) (42,453) (42,453) (42,453)
 ___________ ___________ ___________ ___________ ___________ _________ ___________ __________ ___________
 Net Income Before Fixed Charges $ 493,266 $ 741,641 $ 596,804 $ 1,831,711 $ 1,305,381 $201,049 $ 1,506,430 $ 795,658 $ 2,101,039
Fixed Charges 357,934 352,139 340,680 1,050,753 838,291 838,291 838,291
 ___________ ___________ ___________ ___________ ____________ _________ ___________ __________ ___________
 Net Income $ 135,332 $ 389,502 $ 256,124 $ 780,958 $ 467,090 $201,049 $ 668,139 $ 795,658 $ 1,262,748
 =========== =========== =========== =========== =========== ======== =========== ========== ===========
Equity $37,703,230 $38,080,057 $38,323,467 $38,035,585 $30,344,790 $30,344,790 $30,344,790
 =========== =========== =========== =========== =========== =========== ===========
Return on Equity (Annual Level) 6.16% 8.81% 16.65%
 =========== =========== ===========
(A) Supersedeas Revenue Granted $1,573,359 ÷ 4
(B) Supersedeas Revenue Requested $6,226,624 ÷ 4
Note: Actual Intrastate Minutes of Use for the twelve months ended December 31, 1984 were as follows:
 Interlata 25,348,609
 Intralata 80,695,735
 ___________
 106,044,344
 ===========

*1219 APPENDIX D

 CONTINENTAL TELEPHONE COMPANY OF THE SOUTHALABAMA
 Report to the Supreme Court of Alabama
 ASPC Docket No. 18978
 Per Books Effect of Supersedeas Effect of Full
 Per Granted Supersedeas 
 March Books
 1985 April 1985 May 1985 Total Intrastate Increase Adjusted Increase Adjusted 
Revenue
 Local Service $ 1,611,691 $ 1,628,758 $ 1,649,859 $ 4,890,308 $ 4,890,308 $393,340(A) $ 5,283,648 $1,556,656(B) $ 6,446,964
 Network Access 1,646,337 1,864,881 1,714,814 5,226,032 2,767,451 2,767,451 2,767,451
 Miscellaneous 124,739 124,069 163,759 412,567 393,323 393,323 393,323
 ___________ ___________ ___________ ___________ ___________ ___________ ___________ __________ ___________
 Total $ 3,382,767 $ 3,617,708 $ 3,528,432 $10,528,907 $ 8,051,082 $393,340 $ 8,444,422 $1,556,656 $ 9,607,738
 Uncollectible Revenue 22,496 21,440 (115,259)(C) (71,323) (71,323) 626 (70,697) 2,477 (68,846)
 ___________ ___________ ___________ ___________ ____________ __________ ___________ __________ ___________
 Total Operating Revenue $ 3,360,271 $ 3,596,268 $ 3,643,691 $10,600,230 $ 8,122,405 $392,714 $ 8,515,119 $1,554,179 $ 9,676,584
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
Expenses
 Maintenance $ 701,170 $ 834,199 $ 839,804 $ 2,375,173 $ 1,860,948 $ 1,860,948 $ 1,860,948
 Depreciation 732,393 807,533 720,881 2,260,807 1,776,768 1,776,768 1,776,768
 Traffic 127,889 67,650 100,679 296,218 213,544 213,544 213,544
 Commercial 178,924 223,797 103,328 506,049 423,461 423,461 423,461
 General Office Salaries & Expense 290,209 450,295 320,393 1,060,897 833,009 833,009 833,009
 Other Operating 394,245 247,415 10,543 652,203 504,721 504,721 504,721
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total Operating Expenses $ 2,424,830 $ 2,630,889 $ 2,095,628 $ 7,151,347 $ 5,612,451 $ 5,612,451 $ 5,612,451
 ----------- ----------- ----------- ----------- ----------- ----------- -----------
Taxes
 Other Operating Taxes $ 222,976 $ 250,968 $ 210,645 $ 684,589 $ 578,416 $ 9,818 $ 588,234 $ 38,854 $ 617,270
 State Income Tax 29,279 48,524 33,956 111,759 78,086 10,583 88,669 41,884 119,970
 Federal Income Tax 92,310 96,792 381,809 570,911 398,895 171,264 570,159 677,783 1,076,678
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Taxes $ 344,565 $ 396,284 $ 626,410 $ 1,367,259 $ 1,055,397 $191,665 $ 1,247,062 $ 758,521 $ 1,813,918
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Operating Income $ 590,876 $ 569,095 $ 921,653 $ 2,081,624 $ 1,454,557 $201,049 $ 1,655,606 $ 795,658 $ 2,250,215
Other Income 5,928 (4,930) 28,874 29,872 20,872 20,872 20,872
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Income Before Fixed Charges $ 596,804 $ 564,165 $ 950,527 $ 2,111,496 $ 1,475,429 $201,049 $ 1,676,478 $ 795,658 $ 2,271,087
Fixed Charges 340,680 391,292 391,998 1,123,970 896,703 896,703 896,703
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Income $ 256,124 $ 172,873 $ 558,529 $ 987,526 $ 578,726 $201,049 $ 779,775 $ 795,658 $ 1,374,384
 =========== =========== =========== =========== =========== ======== =========== ========== ===========
Equity $38,323,467 $38,463,814 $38,009,817 $38,599,033 $30,794,309 $30,794,309 $30,794,309
 =========== =========== =========== =========== =========== =========== ===========
Return on Equity (Annual Level) 7.52% 10.12% 17.84%
 =========== =========== ===========
(A) Supersedeas Revenue Granted $1,573,359 ÷ 4
(B) Supersedeas Revenue Requested $6,226,624 ÷ 4
(C) The credit balance is a result out-of-period credit entry of $137,989.
Note: Actual Intrastate Minutes of Use for the twelve months ended December 31, 1984 were as follows:
 Interlata 25,348,609
 Intralata 80,695,735
 ___________
 106,044,344
 ===========

*1220 APPENDIX E

 CONTINENTAL TELEPHONE COMPANY OF THE SOUTHALABAMA
 Report to the Supreme Court of Alabama
 ASPC Docket No. 18978
 Effect of Supersedeas Effect of Full
 Per Books Per Granted Supersedeas 
 Books
 April 1985 May 1985 June 1985 Total Intrastate Increase Adjusted Increase Adjusted 
Revenue
 Local Service $ 1,628,758 $ 1,649,859 $ 1,642,219 $ 4,920,836 $ 4,920,836 $393,340(A) $ 5,314,176 $1,556,656(B) $ 6,477,492
 Network Access 1,864,881 1,714,814 2,156,114 5,735,809 3,033,074 3,033,074 3,033,074
 Miscellaneous 124,069 163,759 117,641 405,469 388,732 388,732 388,732
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total $ 3,617,708 $ 3,528,432 $ 3,915,974 $11,062,114 $ 8,342,642 $393,340 $ 8,735,982 $1,556,656 $ 9,899,298
 Uncollectible Revenue 21,440 (115,259)(C) 24,089 (69,730) (69,730) 626 (69,104) 2,477 (67,253)
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Revenue $ 3,596,268 $ 3,643,691 $ 3,891,885 $11,131,844 $ 8,412,372 $392,714 $ 8,805,086 $1,554,179 $ 9,966,551
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
Expenses
 Maintenance $ 834,199 $ 839,804 $ 859,535 $ 2,533,538 $ 1,985,027 $ 1,985,027 $ 1,985,027
 Depreciation 807,533 720,881 718,690 2,247,104 1,765,999 1,765,999 1,765,999
 Traffic 67,650 100,679 95,569 263,898 190,244 190,244 190,244
 Commercial 223,797 103,328 291,219 618,344 517,430 517,430 517,430
 General Office Salaries & Expense 450,295 320,393 316,052 1,086,740 853,834 853,834 853,834
 Other Operating 247,415 10,543 376,905 634,863 490,793 490,793 493,793
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total Operating Expenses $ 2,630,889 $ 2,095,628 $ 2,657,970 $ 7,384,487 $ 5,803,327 $ 5,803,327 $ 5,803,327
 ----------- ----------- ----------- ----------- ----------- ----------- -----------
Taxes
 Other Operating Taxes $ 250,968 $ 210,645 $ 196,716 $ 658,329 $ 557,895 $ 9,818 $ 567,713 $ 38,854 $ 596,749
 State Income Tax 48,524 33,956 22,914 105,394 69,982 10,583 80,565 41,884 111,866
 Federal Income Tax 96,792 381,809 252,173 730,774 485,234 171,264 656,498 677,783 1,163,017
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Taxes $ 396,284 $ 626,410 $ 471,803 $ 1,494,497 $ 1,113,111 $191,665 $ 1,304,776 $ 758,521 $ 1,871,632
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
 Net Operating Income $ 569,095 $ 921,653 $ 762,112 $ 2,252,860 $ 1,495,934 $201,049 $ 1,696,983 $ 795,658 $ 2,291,592
Other Income (4,930) 28,874 13,488 37,432 24,855 24,855 24,855
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ____________
 Net Income Before Fixed Charges $ 564,165 $ 950,527 $ 775,600 $ 2,290,292 $ 1,520,789 $201,049 $ 1,721,838 $ 795,658 $ 2,316,447
Fixed Charges 391,292 391,998 385,541 1,168,831 932,493 932,493 932,493
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Income $ 172,873 $ 558,529 $ 390,059 $ 1,121,461 $ 588,296 $201,049 $ 789,345 $ 795,658 $ 1,383,954
 =========== =========== =========== =========== =========== ======== =========== ========== ===========
Equity $38,463,814 $39,009,817 $39,387,350 $38,953,660 $31,077,230 $31,077,230 $31,077,230
 =========== =========== =========== =========== =========== =========== ===========
Return on Equity (Annual Level) 7.57% 10.16% 17.81%
 =========== =========== ===========
(A) Supersedeas Revenue Granted $1,573,359 ÷ 4
(B) Supersedeas Revenue Requested $6,226,624 ÷ 4
(C) The credit balance is a result of an out-of-period credit entry of $137,989.
Note: Actual Intrastate Minutes of Use for the twelve months ended December 31, 1984 were as follows:
 Interlata 25,348,609
 Intralata 80,695,735
 ___________
 106,044,344
 ===========

*1221 APPENDIX F

 CONTINENTAL TELEPHONE COMPANY OF THE SOUTHALABAMA
 Report to the Supreme Court of Alabama
 ASPC Docket No. 18978
 Effect of Supersedeas Effect of Full
 Per Books Per Granted Supersedeas 
 Books
 May 1985 June 1985 July 1985 Total Intrastate Increase Adjusted Increase Adjusted 
Revenue
 Local Service $ 1,649,859 $ 1,642,219 $ 1,712,205 $ 5,004,283(E) $ 5,004,283 $393,340(A) $ 5,397,623 $1,556,656(B) $ 6,560,939
 Network Access 1,714,814 2,156,114 1,719,339 5,590,267 2,912,198 2,912,198 2,912,198
 Miscellaneous 163,759 117,641 263,413(D) 544,813 425,643 425,643 425,643
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total $ 3,528,432 $ 3,915,974 $ 3,694,957 $11,139,363 $ 8,342,124 $393,340 $ 8,735,464 $1,556,656 $ 9,898,780
 Uncollectible Revenue (115,259)(C) 24,089 19,833 (71,337) (71,337) 626 (70,711) 2,477 (68,860)
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Revenue $ 3,643,691 $ 3,891,885 $ 3,675,124 $11,210,700 $ 8,413,461 $392,714 $ 8,806,175 $1,554,179 $ 9,967,640
 ----------- ----------- ----------- ----------- ----------- -------- ----------- ---------- -----------
Expenses
 Maintenance $ 839,804 $ 859,535 $ 816,397 $ 2,515,736 $ 1,971,079 $ 1,971,079 $ 1,971,079
 Depreciation 720,881 718,690 734,840 2,174,411 1,708,870 1,708,870 1,708,870
 Traffic 100,679 95,569 95,703 291,951 210,467 210,467 210,467
 Commercial 103,328 291,219 274,504 669,051 559,862 559,862 559,862
 General Office Salaries & Expense 320,393 316,052 325,972 962,417 756,518 756,518 756,518
 Other Operating 10,543 376,393 315,333 702,781 544,066 544,066 544,066
 ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Total Operating Expenses $ 2,095,628 $ 2,657,970 $ 2,562,749 $ 7,316,347 $ 5,750,862 $ 5,750,862 $ 5,750,862
 ----------- ----------- ----------- ----------- ----------- ----------- -----------
Taxes
 Other Operating Taxes $ 210,645 $ 196,716 $ 196,291 $ 603,652 $ 515,316 $ 9,818 $ 525,134 $ 38,854 $ 554,170
 State Income Tax 33,956 22,914 40,586 97,456 63,590 10,583 74,173 41,884 105,474
 Federal Income Tax 381,809 252,173 141,292 775,274 505,866 171,264 677,130 677,783 1,183,649
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Total Operating Taxes $ 626,410 $ 471,803 $ 378,169 $ 1,476,382 $ 1,084,772 $191,665 $ 1,276,437 $ 758,521 $ 1,843,293
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Operating Income $ 921,653 $ 762,112 $ 734,206 $ 2,417,971 $ 1,577,827 $201,049 $ 1,778,876 $ 795,658 $ 2,373,485
Other Income 28,874 13,488 6,517 48,879 31,894 31,894 31,894
 ___________ ___________ ___________ ___________ ___________ ________ ___________ __________ ___________
 Net Income Before Fixed Charges $ 950,527 $ 775,600 $ 740,723 $ 2,466,850 $ 1,609,721 $201,049 $ 1,810,770 $ 795,658 $ 2,405,379
Fixed Income 391,998 385,541 373,064 1,150,603 917,951 917,951 917,951
 ___________ ___________ ___________ ___________ ___________ ________ ___________ ---------- -----------
 Net Income $ 558,529 $ 390,059 $ 367,659 $ 1,316,247 $ 691,770 $201,049 $ 892,819 $ 795,658 $ 1,487,428
 =========== =========== =========== =========== =========== ======== =========== ========== ===========
Equity $39,009,817 $39,387,350 $39,697,483 $39,364,883 $31,405,304 $31,405,304 $31,405,304
 =========== =========== =========== =========== =========== =========== ===========
Return on Equity (Annual Level) 8.81% 11.37% 18.94%
 =========== =========== ===========
(A) Supersedeas Revenue Granted $1,573,359 ÷ 4
(B) Supersedeas Revenue Requested $6,226,624 ÷ 4
(C) The credit balance is a result of an out-of-period credit entry of $137,989.
(D) Billing and Collection Revenue was reclassified from Network Access to Miscellaneous Revenue in July.
(E) Includes the effect of the rate increase granted June 22, 1985.
Note: Actual Intrastate Minutes of Use for the twelve months ended December 31, 1984 were as follows:
 Interlata 25,348,609
 Intralata 80,695,735
 ___________
 106,044,344
 ===========

*1222 ON APPLICATION FOR REHEARING
PER CURIAM.
The Honorable George C. Wallace, as Governor, as an intervenor in this case, has requested a rehearing in this cause, and makes the following claims:
(a) The issue of the Governor's use of the assistance of personnel loaned to him by the Commission in his participation in the instant Commission proceeding was not ripe for decision by this Court;
(b) The Court's decision effectively denied the Governor's intervention in the rate proceeding;
(c) The Court failed to address valid provisions of Section 37-1-18, Code of Alabama, which authorize the Governor, as well as the chairman of the public service commission and the attorney general, to hire attorneys, public service commission staff personnel, and expert witnesses "to present the case for the consumer in utility rate increase hearings and all appeals arising therefrom"; and
(d) This Court's holding that the Commission's order imputing interest on Continental's Job Development Investment Tax Credits was erroneous is incorrect, as a matter of law.
Regarding the "due process" claims, the Governor claims that the record on appeal was inadequate to support Continental's claims of "due process" violations, and that this Court ignored statutory provisions which authorized the Governor to intervene in the proceeding, hire attorneys, and present evidence. Specifically, the Governor says that "the Court failed to address the provisions of Section 37-1-18, Code of Alabama that the Consumer Utility Rate Hearing Fund may be ... drawn upon by the chairman of the public service commission, the governor, and the attorney general for purposes of hiring attorneys, public service commission staff personnel, and expert witnesses to present the case for the consumer in utility rate increase hearings and all appeals arising therefrom."
After reviewing the Governor's contentions, we are still of the opinion that Continental adequately demonstrated that it was not accorded "fundamental fairness" in the rate hearing; therefore, we are of the opinion that the Governor's application for rehearing on the "due process" issue is due to be denied.
The Governor, in his brief, claims that this Court's "holding" regarding JDIC is erroneous, as a matter of law. Because we addressed the issues raised by Continental on appeal, we can understand how the Governor construed our opinion as being a "holding" on that question. The opinion states, however, as follows:
"Even though we elect to remand the cause for `further proceedings,' we have, nevertheless, reviewed Continental's claims on the merits, and, to facilitate the process on remand, we include our observations, which the parties may use and which the Commission may consider and apply. In reviewing the merits of Continental's claims, we have considered all the evidence and all the arguments, because we believe that such a review will assist the Commission and the parties in the proceedings on remand."
As pointed out by us in our original "observations," the Commission, in its brief, admitted that there were substantial disputes whether the interest synchronization methodology utilized by the Commission would violate provisions of the Internal Revenue Code. The Governor claims that a proposed Federal Treasury regulation issued after this case was appealed conclusively shows thatthe Commission's treatment of JDIC will not violate the Internal Revenue Code. On remand, the parties, of course, may present evidence or authority in support of their respective positions on this question.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and HOUSTON, JJ., concur.
ADAMS, J., not sitting.
NOTES
[1] In its petition for reconsideration, Continental requested the Commission to reconsider the "Commission Final Order" solely with respect to:

1. Inside Wire. Continental did not request reconsideration of the Commission's denial of Continental's request to deregulate inside wire, but submitted that the "Commission Final Order" was incorrect in calculating the mathematical effect of such denial upon income available for return.
2. Intrastate Toll Revenues. Continental submitted that the Commission should use the minutes of use ("MOU") actually tabulated by Continental in 1984 and submitted in this case by the testimony of William A. Yaconis, a witness of Continental. Continental requested reconsideration only of the MOU employed in the calculation and did not request reconsideration of any other aspect of the "Commission Final Order" concerning intrastate toll revenues.
The Public Staff requested the Commission to reconsider the calculation of access charges related to intrastate toll revenues and the customer premises equipment ("CPE") interstate offset.
[2] Telephone Company of the South (Continental) on September 17, 1984, filed its application pending appeal pursuant to Section 31-1-141 [should have read 37-1-141] and Section 31-1-127 [should have read 37-1-127] through 128, Code of Alabama 1975, as amended to supersede the order of August 16, 1984, of the Alabama Public Service Commission (Commission), APSC Docket No. 18978, and to allow Continental to charge and collect the increase in its rates as filed with the Commission in this cause.
"The application states, under oath, that the estimated approximate amount by which Continental revenues will be increased in six months by reason of the increased rates and charges sought is $3,179,413 (approximately $6,226,624 annually).
"The application for supersedeas being argued and submitted and duly examined,
"IT IS CONSIDERED by the Court that, pending appeal of this cause, Continental is entitled to have the order of the Commission superseded to the extent that the company may charge and collect, pending appeal, at a rate that will produce an additional annual increase in revenues of $1,573,359 over the $366,985 [should have read $367,352] annual revenue increase awarded by the Commission, the Court being of the opinion that Continental has established its need for supersedeas in the following categories, and in the following amounts:

"Inside Wire $ 364,021
Intrastate Toll Revenues $ 947,068
Payroll Expenses $ 124,553
Interest & Synchronization $ 137,717
 __________
 $1,573,359

"IT IS, THEREFORE, ORDERED that Continental file with the Commission, pending appeal, a schedule of rates and charges which will produce an additional annual increase in revenues of $1,573,359 over the annual amount awarded by the Commission in its order of August 16, 1984, and that Continental shall state, in writing, under oath, to this Court the approximate amount by which its revenues will be increased in six months by reason of such rates, pending appeal, pursuant to this order.
"IT IS FURTHER ORDERED that Continental file with this Court a report as hereinafter prescribed on or before February 18, 1985, reflecting the experience of Continental for the preceding three months. Additional reports shall be filed with the Court monthly thereafter during the pendency of this appeal.
"The reports required to be filed shall contain the following computations:
"1. The annualized rate of return to equity collected under supersedeas as granted by this Court.
"2. The annualized rate of return to equity under the Commission's order without supersedeas in any amount.
"3. Compute the annual rate of return to equity under full supersedeas.
"All filings made pursuant to this order shall be made available to all of the parties to this cause.
"It is noted that Continental has filed its supersedeas bond in this cause on September 17, 1984. Said bond is hereby approved."
[3] In his brief on supersedeas, page 8, the Attorney General said: "Whatever the method employed, it would appear the company is due $364,021 in additional revenues."